UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES LAMAR GRIFFIN,

      Petitioner,

v.                                    Case No. 8:09-cv-1816-T-17MAP

SECRETARY DEPARTMENT OF CORRECTIONS,

      Respondent.

_____/

## ORDER

This cause is before the Court on Petitioner James Lamar Griffin's  timely-filed 28 U.S.C. § 2254 petition. (Doc. 1).  Respondent filed a response to the petition (Doc. 10). Although Griffin was allowed time to do so, he did not file a reply to the response. Griffin challenges his convictions for Robbery With a Firearm, Driving While License Suspended or Revoked, and Fleeing and Eluding arising out of charges filed in the Tenth Judicial Circuit in Polk County, Florida, in state circuit case number CF02-05635A-XX.

A review of the record demonstrates that, for the following reasons, the petition must be **denied.**

PROCEDURAL HISTORY

On October 18, 2002, Griffin was charged by Information with robbery with a firearm (Count 1), driving while license suspended or revoked (Count 2), and felony fleeing or attempting to elude (high speed). (Exh 22: R 49-50). The case proceeded to a jury trial before the Honorable Roger Alcott, Circuit Judge, on December 13, 2004. Griffin was

represented by Assistant Public Defender Robert Trogolo. The jury found Griffin guilty as charged on Counts 1 and 2, and guilty of the lesser included offense of fleeing to elude a law enforcement officer on Count 3. (Exh 22: Vol. 1: 59- 60). On February 4, 2005, the court adjudicated Griffin guilty and imposed a life sentence on Counts 1 and 2, and a five-year prison sentence on Count 3. (Exh 22: Vol. 1: R 93-102).

Griffin pursued a direct appeal. His appointed counsel, Special Assistant Public Defender James C. Banks, Esquire, filed an initial brief raising one issue: "WHETHER THE EVIDENCE PRESENTED BY THE STATE IS SUFFICIENT TO OVERCOME THE APPELLANT'S REASONABLE HYPOTHESIS OF INNOCENSE." (Exhibit 1). The State filed an answer brief. (Exhibit 2). On November 18, 2005, in Case No. 2D05-865, the Second District Court of Appeal per curiam affirmed Griffin's judgment and sentence. (Exhibit 3). *Griffin v. State*, 915 So. 2d 1206 (Fla. 2d DCA 2005)[table]. The mandate issued December 9, 2005. (Exhibit 4).

On June 16, 2006, Griffin filed a pro se Motion for Postconviction Relief pursuant to Florida Rule of Criminal Procedure 3.850. (Exhibit 5). Griffin raised eight grounds for relief with several sub-claims. Griffin alleged trial counsel was ineffective for: (1) failing to interview and call at trial three potential alibi witnesses, Walter Harvey, Williamson Dimanche, and Shanita Howard; (2) failing to make a motion for a judgment of acquittal as to the charge of robbery with a firearm because there was no evidence presented that the Defendant carried a firearm; (3) failing to move for a mistrial and the disqualification of the trial judge when the trial judge failed to remain impartial by asking counsel their opinion on whether an instruction on the law of principals was needed; (4) failing to object to the

placement of the law of principals instruction after instructions on the crimes as charged and their lesser included offenses thus indicating to the jury that their finding the Defendant a "principal" was a lesser included offense of the charged offenses; (5) failing to make a motion in limine to exclude testimony linking an SUV seen in the vicinity of the crime scene with a SUV later stopped by the police; (6)(a) failing to adequately prepare for trial by visiting the crime scenes and locating and interviewing potential witnesses; (b) failing to investigate the identity of other green SUVs that may have been parked at the scene of the crime; (7)(a) failing to file a motion to suppress or otherwise object to the introduction into evidence or testimony concerning a photograph, State's exhibit 15, purporting to be of the Defendant; (b) failing to make a motion to suppress or otherwise object to the introduction into evidence or testimony concerning other photographs purporting to be of the Defendant; (c) failing to file a motion to suppress or otherwise object to the introduction into evidence or testimony concerning a photograph of a green SUV purporting to be the vehicle used in the crime; and (8) failing to file a motion to sever Count 1 from Counts 2 and 3.

On November 17, 2006, the court issued an order summarily denying grounds 2, 3, 4, and 5 of the Rule 3.850 motion, and directing the State to show cause why Griffin was not entitled to relief on grounds 1, 6(a), 6(b), 6(c), 7(a), 7(b), 7(c), and 8. (Exhibit 6). The State filed its response on November 27, 2006, conceding Griffin was entitled to an evidentiary hearing on ground 1, but urging the court to deny the remaining grounds. (Exhibit 7). On December 22, 2006, the court issued an order in which it granted an evidentiary hearing on ground 1 of Griffin's motion, and summarily denied the remaining claims based on the record and the State's response. (Exhibit 8).

The evidentiary hearing was held before the Honorable Steven Selph, Circuit Judge, on April 27, 2007. (Exhibit 9). Griffin was represented by attorney Jackson Flyte, Esquire. The court heard testimony from Griffin's trial attorney, Robert Trogolo, Petitioner Griffin, and alleged alibi witnesses William Harvey and Shanita Howard. The attorneys for the State and the defense presented closing arguments. On May 11, 2007, the court issued its final order denying the motion for postconviction relief. (Exhibit 10). Griffin appealed the adverse rulings. He filed an initial pro se brief raising four issues, which challenged only the rulings on grounds five, six, seven, and eight of the postconviction motion. (Exhibit 11). The State filed an answer brief (Exhibit 12), and Griffin filed a reply brief (Exhibit 13). On August 8, 2008, in case No. 2D07-2880, the appellate court per curiam affirmed the trial court's denial of postconviction relief. (Exhibit 14). *Griffin v. State*, 4 So. 3d 1231 (Fla. 2d DCA 2008)[table]. Griffin filed a motion for rehearing (Exhibit 15), which the appellate court denied in an order filed September 25, 2008. (Exhibit 16). The mandate issued October 15, 2008. (Exhibit 17).

On November 12, 2008, Griffin filed in the trial court a Motion To Correct Illegal Sentence pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure. (Exhibit 18). Griffin argued that the life sentence for robbery was illegal under Florida law. On December 8, 2008, the trial court issued an order summarily denying the motion to correct sentence. (Exhibit 19). Griffin filed an appeal. On July 1, 2009, in Case No. 2D09-324, the state appellate court filed a per curiam opinion, with citations, affirming Griffin's sentence. (Exhibit 20). *Griffin v. State*, 12 So. 3d 228 (Fla. 2d DCA 2009)[table]. The mandate in that case issued July 27, 2009. (Exhibit 21).

Griffin presented the § 2254 petition to prison officials for mailing on September 1, 2009. (Doc. 1). The petition three grounds for relief: 1) WHETHER THE FLORIDA STATE COURTS ABUSED THEIR DISCRETION WHERE THE STATE COURT'S DECISION RESTS UPON A CLEARLY ERRONEOUS FINDING OF FACT, AN ERRANT CONCLUSION OF LAW, AND AN IMPROPER APPLICATION OF FACT, IN THAT THE STATE COURT DID NOT PRESENT SUFFICIENT EVIDENCE TO SUPPORT HIS CONVICTION FOR ROBBERY WITH A FIREARM; 2) WHETHER THE FLORIDA STATE COURTS ABUSED THEIR DISCRETION WHERE THE STATE COURT'S DECISION FAILED TO ADDRESS GRIFFIN'S POSTCONVICTION CLAIM ALLEGING INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO MOVE THE TRIAL COURT TO SEVER COUNT 1 FROM COUNTS 2 AND 3; and 3)WHETHER THE FLORIDA COURTS' DETERMINATION OF THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM AFTER AN EVIDENTIARY HEARING WAS CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW.

STANDARDS OF REVIEW

AEDPA Standard

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involve an

"unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). Indeed, it is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." Id. *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

Ineffective Assistance of Counsel Standard

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

DISCUSSION

Ground One

Griffin contends, as he did on direct appeal, that there was insufficient evidence presented at trial to overcome Griffin's hypothesis of innocence. Specifically, Griffin asserts the State failed to prove Griffin's identity as one of the two robbers. At trial, Griffin presented an alibi defense. Griffin is not entitled to relief on Ground One for the following reasons.

First, Griffin failed to exhaust his federal constitutional claim in the state court. In *Pearson v. Sec'y, Dep't of Corr.,* 273 Fed. Appx. 847 (11th Cir. April 15, 2008)

- 6 -

(unpublished), the Eleventh Circuit noted the necessity of exhausting federal claims in the

state court:

> The AEDPA requires a state prisoner to exhaust all available state court remedies, either on direct appeal or in a state post-conviction proceeding, 28 U.S.C. § 2254(b)-(c), thereby giving the state the opportunity to correct its alleged violations of federal rights. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The exhaustion doctrine requires the petitioner to "fairly present" his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (citation omitted). The petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id.* (quoting *Picard*, 404 U.S. at 277).

273 Fed. Appx. at 849-850. In *Pearson*, the court stated that, "[a]lthough Florida courts

assess the sufficiency of the evidence under the standard applied in [*Jackson v. Virginia*,

443 U.S. 307(1979)], the basis of Pearson's argument was that there was no evidence of

reasonable fear on the part of the victim, as defined by state law. Nothing in this argument

would have alerted the state court to the presence of a federal claim about due process,"

so the federal claim was not exhausted.

Similarly, in the instant case, the crux of Griffin's argument in the state court and the

federal petition is that the circumstantial evidence was insufficient to overcome Griffin's

theory of innocence regarding the robbery conviction. A review of the motion for judgment

of acquittal at trial, and Griffin's argument in the initial brief on direct appeal, shows Griffin

presented only state law in his arguments regarding sufficiency of the evidence, and did

not cite federal cases or the United States Constitution, nor did he use terms such as "due

process" or "federal law." (See Exh 22: Vol. 3: T 357-359; Exh 1: Initial Brief of Appellant at pp. 7-10). In short, there is nothing in Griffin's arguments to the trial and appellate courts that would have alerted the state courts to an attempt to present a federal constitutional claim. To the extent Griffin now raises a constitutional claim in the instant petition, such claim has not been exhausted, and is procedurally barred. E

Even if the claim is not barred, however, Griffin is not entitled to relief on the merits. In its answer brief on direct appeal, the State set out the following statement of facts:

Richard Tucker testified he owned a green Toyota 4- Runner and, on August 24, 2002, he was out riding around looking for crack cocaine when he came into contact with a black male named "Munchie" at a BP station in Florence Villa. (V2:T 105-06.) Munchie also gave him the name of "James." (V2:T 110.)

Tucker asked Munchie if he could get him some crack cocaine and Munchie sold him some and then got in the truck with him and they rode around together for several hours that day looking for more cocaine. (V2:T 106-07.) They stopped at a couple of places but did not find any more crack. (V2:T 107.) Munchie told Tucker he could get some, but he needed to use Tucker's truck. (V2:T 107.) Munchie told Tucker he could not go with him and then dropped Tucker off at his house. (V2:T 107.) This was about 4:30 in the afternoon. (V2:T 107.)

Tucker identified State's Exhibits 5A, 5B, and 5C as pictures of his green 4-Runner. (V2:T 108.) Tucker did not get his 4-Runner back that night and the next morning Detective Dan Martin came to his house. Martin asked what he was doing and Tucker told him he was waiting for his truck to get back. (V2:T 109.) Tucker told Detective Martin the kind of truck it was and the tag number and Detective Martin told him they had located it. (V2:T 110.) Tucker identified State's Exhibit 12 as the photo of the person who borrowed his truck, which he had he selected from a bunch of photos shown to him by Detective Martin. (V2:T 110.)

Calvin Graham worked as a cashier at the Dollar General Store in Winter Haven on August 24, 2002. (V3:T 319-21.) At dusk, which he estimated to be 7:00 to 8:00, the store was robbed. (V3:T 321.) Two men came in with their shirts over their faces and one had a handgun. (V3:T 321.) They both had black shirts and caps. (V3:T 321.)

The one without the handgun approached and said, "you know what this is[,]" and Graham turned around and said, "yes." (V3:T 322.) This was the taller, slender man. (V3:T 322-23.) That man was giving most of the orders. (V3:T 323.) The man with the gun stayed about two or three feet behind and did not do too much. (V3:T 323.)

The man without the gun told Graham to open the register, but he could not without scanning something, so the man reached across the counter and gave him a can of peanuts. (V3:T 324-25.) He was saying, "hurry up," and Graham was nervous, so he could not really open the register, and they started saying, "shoot him, he's taking too long[,]" and Graham kept trying to scan the peanuts, but for some reason the register would not open. (V3:T 325.)

After he scanned the can of peanuts, and finally got the register to come open, he sat the can back down. (V3:T 325-26.) Once the drawer popped open, the taller man told Graham to go to the rear of the store and he did so. (V3:T 326.) When he got back there, his manager was already calling the police. (V3:T 327.) When they did the count at the end of the day, over six hundred dollars was missing. (V3:T 327.)

James Harrison testified he went to the Dollar General about five o'clock on the day in question. (V2:T 125.) He saw a green 4-Runner parked at the end of the plaza, to the right of the café, which is to the immediate right of the Dollar General store. (V2:T 118.) He noticed the lights were on and it was still light out. (V2:T 118, 128-29.) As he and his wife walked into the Dollar General, they saw two guys at the cash register robbing the place. (V2:T 119.) They had on all black. (V2:T 119.) He could not see their faces, but one of them had a handgun. (V2:T 119.) Mr. Harrison and his wife went to the back of the store. (V2:T 122.)

The cashier told them to put the gun down and asked them not to shoot him. (V2:T 121.) The guy with the gun was black, kind of short and slender, about five feet five inches tall. (V2:T 121.) The other man was slender and between five feet ten inches to six feet tall. (V2:T 121.) When the robbers left, they ran out and took a left, which would be toward the café and where the 4-Runner was parked. (V2:T 122-23.) After they left, Mr. Harrison went outside and saw the 4-Runner was gone. (V2:T 123.) He left the store after the cashier ran into the room and he saw the robbers were gone. (V2:T 134.)

Peggy McLendon worked as an assistant manager at the Dollar General and she said she saw the two robbers with their shirts over their faces. (V2:T 140.) She saw what was happening, so she walked slowly to the back and called 911. (V2:T 140.) She stayed on the phone with 911 and then all of a

sudden the cashier came busting through the door, grabbed the phone from her and tried to call 911 again because he did not know she was on with them. (V2:T 140, 144.)

As assistant manager, she counts the registers and does the banking. (V2:T 141.) At the time of the robbery, there was around eight hundred dollars in the register. (V2:T 142.) They took a reading. (V2:T 147- 48.) They usually keep around five hundred dollars in the register. (V2:T 142.) Charles Bird is a police officer with Winter Haven Police Department. (V2:T 150.) He heard a call that a robbery had taken place at the Dollar General on Cypress Gardens Boulevard. (V2:T 151-52.) A BOLO went out for a green, Toyota 4-Runner. (V2:T 152.)

Once he heard this information, he headed to a place where he thought he might possibly see the 4-Runner. (V2:T 153.) He went over to Sixth Street because that is a street that is often utilized in robberies that take place on the south end of town if they are headed north. (V2:T 153.) In addition, he knew the locations of other officers and that was a particular area that was not covered, so he went there in an attempt to find the vehicle they were looking for and he did see a green 4- Runner go past him when he got to Sixth Street and Central Avenue. (V2:T 153.) It was consistent in time and place with where one might expect to see a green 4- Runner leaving the Dollar General. (V2:T 154.)

Officer Bird said he got in behind the 4-Runner after going around a few other cars. (V2:T 154-56.) He was in a marked police car and he was in uniform. (V2:T 156-57.) When he caught up to the 4-Runner, it was doing the speed limit of thirty to thirty-five miles per hour. (V2:T 158.) As they went up Sixth Street, the 4-Runner turned left onto Avenue K, with Officer Bird behind it. (V2:T 158-59.) Bird activated his flasher lights in the grill and strobe lights on the front and back dash. (V2:T 159.) He did not activate his siren at this point. (V2:T 160.)

The 4-Runner turned again. (V2:T 160.) It was still going the speed limit, but it was not stopping, so Bird turned on his siren to get the attention of the driver. (V2:T 160.)

He could see through the car that the driver appeared to be taller than the passenger and had the little, stubby pigtail things, with some kind of cap on. (V2:T 161.) The passenger appeared to be shorter and had the same little pigtails. (V2:T 161.)

When he turned his siren on, the 4-Runner began to speed up past the speed limit and it continued on. (V2:T 171-62.) As they got to Avenue O, the

4-Runner accelerated very quickly and then it went over the curb and into the grassy area of the HUD project. (V2:T 162.) The car then went over the grassy area and into the parking lot where a birthday party was going on with twenty-five to thirty kids and adults. (V2:T 162-63.) The 4-Runner was being operated very erratically at this time. (V2:T 163.) When the car hit the curb, the driver started losing control of the 4-Runner and it went over the curb and into the parking lot and around the building. (V2:T 163.) Bird was still behind the 4- Runner at that time. (V2:T 163.)

As the 4-Runner went into Orange Circle, it veered around to where there is a cut-through in the fence that goes down to a lift station and foot path onto Palmetto. (V2:T 163.) As the 4-Runner came across, the passenger and driver bailed out of the car and ran back into the break in the fence, where the lift station is. (V2:T 163-64.) They actually had to come back towards Officer Bird to get to the cut-through in the fence. (V2:T 165.)

Officer Bird said he was  about fifteen to twenty yards from the 4-Runner and he saw the driver when he jumped out. (V2:T 167.) The driver was about five feet eleven inches tall, a hundred and seventy pounds, wearing a black shirt and a black hat. (V2:T 167.) He estimated him to be eighteen or nineteen years old. (V2:T 167.) The driver went through the cut-through. (V2:T 167.)

The passenger came out and went through the same cut-through. (V2:T 168.) The passenger actually ran right back at Bird and then cut through to the pathway, so Bird was able to take a look at him. (V2:T 169.) The passenger had dreads, a little hat, black jeans shorts and a dark-colored shirt. (V2:T 169.) He was about five feet seven inches tall and weighed about one hundred and forty pounds. (V2:T 169.)

Another officer, Officer Castle, had come in and was going toward the 4-Runner, which is why it stopped. (V2:T 168.) Officer Castle ran past the 4-Runner and began running through and Bird called him off  because they did not have the 4-Runner cleared, and then began setting up a perimeter for a K-9 track. (V2:T 168.)

After the incident, Bird was asked to view a photo line-up. (V2:T 169.) Bird identified State's Exhibits 8 and 9 as the sworn affidavits he signed after being shown the photopacks involved in this case. (V2:T 170.) State's Exhibit 9 was his identification of the passenger, Dwayne Donaldson. (V2:T 172.) He also identified the driver as James Griffin, and he also identified Appellant in court. (V2:T 172.)

Tracy Munson was attending a birthday party on August 24, 2002, at the complex where she lives at Orange Circle in Winter Haven. (V2:T 202-03.)

There were about fifty children and adults there. (V2:T 203.) She was playing cards with three other adults when they saw a 4- Runner come driving off the roadway between the two buildings. (V2:T 204.) They saw the 4-Runner come real fast and heard a whole bunch of police sirens and saw police cars. (V2:T 204.)

The car went across the sidewalk and into the parking lot and swerved and stopped about twenty-five yards in front of where they were. (V2:T 205.) They gathered the kids together and pulled them up closer to the apartment. (V2:T 205.)

When the car stopped, she did not see the driver, but when they got out, she did. (V2:T 206.) There was one police car that came across the sidewalk right behind the 4-Runner and there were other cars coming behind, but they came around through the driveway. (V2:T 206.)

The truck stopped right where the pathway is and she saw two people get out. (V2:T 207.) The passenger was Dwayne Donaldson, whom they call Emmett. (V2:T 207.) The driver was "Munchie" or James Griffin. (V2:T 207.) She has known both of them a long time. (V2:T 207-08.) She identified Appellant in court as the one she knew as "Munchie" or James Griffin. (V2:T 208.)

She got in contact with the police the next day because she knew the persons for whom the police were looking. (V2:T 208-09.) The police came to talk to her and showed her a bunch of photographs to see if she could select the people she saw getting out of the car that day, and she identified State's Exhibits 10 and 11 as the papers she filled out when she viewed the photopacks. (V2:T 209-10.)

Officer Brad Coleman put together the photopacks viewed by Officer Bird and Ms. Munson. (V3:T 227-39.) Officer Bird identified James Griffin and Dwayne Donaldson. (V3:T 239-40.) Ms. Munson also identified Mr. Donaldson and Mr. Griffin. (V3:T 240-41.)

Coleman identified State's Exhibit 15 as a photograph of Appellant that was taken about a month after this incident when he was taken into custody and stated it fairly accurately represented what Appellant looked like on that date. (V3:T 270.) The photograph showed Appellant's hairstyle as being some sort of dreadlock style or possibly a braid-type style. (V3:T 271-72.) He agreed Appellant's hair appears to be kind of knotted up in those sections. (V3:T 272.)

Officer Danny Martin processed and photographed the crime scene and one photo included a peanut can which he was informed had been picked up

by one of the subjects. (V3:T 251-55; 263-66.) He collected that can and submitted it into evidence. (V3:T 255.)

Officer Martin also spoke with Richard Tucker and showed him a photographic line-up from which he picked out the person who had borrowed his 4-Runner vehicle that day. (V3:T 254-55.) Tucker picked out James Griffin's photograph. (V3:T 257.)

Martin has known Appellant approximately ten years and during that time, Appellant's hair is usually in a style that is matted at the end with twists in it, like short dreadlocks. (V3:T 334-35.) State's Exhibit 15 shows Appellant's hair looking as described. (V3:T 335- 36.) Further, Martin has come into contact with Dwayne Donaldson and he is shorter than Appellant. (V3:T 336.)

Maxine Floyd is with the Winter Haven Police Department and her duties include processing crime scenes, processing evidence from crime scenes and taking photographs and latent prints. (V3:T 344.) She was asked to process a peanut can that was on the counter at the Dollar General store. (V3:T 344-45.) She took the label off of the can and dusted it for prints. (V3:T 345-46.) She identified the four latent prints she took from the peanut can, which she then sent to the sheriff's office. (V3:T 346-47.)

Felicia Bowen is a latent print examiner for the Polk County Sheriff's Office. (V3:T 280.) She was asked to compare four latent prints to the known prints of Dwayne Donaldson and James Griffin. (V3:T 287-89.) The latent prints were lifted from a peanut can label. (V3:T 289.) All four of the latent prints matched the known prints of James Griffin. (V3:T 289-90.) In fact, there were only two different prints, so it looks like those two prints were lifted twice. (V3:T 295-96.) Two of the latent prints were identified to the right middle finger of James Griffin and the other two are of his right thumb. (V3:T 297-98.)

Appellant testified he is thirty-seven years old. (V4:T 395.) He said he has been in the Dollar General store before August 24, 2002, shopping for cheap stuff like toilet paper, sodas, and knick knacks. (V4:T 398.) He eats peanuts and has bought them at the Dollar General. (V4:T 398-99.) He said he has touched numerous items in the store and then did not buy them, including cans of peanuts. (V4:T 399.)

Appellant said he came into contact with Richard Tucker, whom he did not know personally, at the BP Station and they rode around in the afternoon for a few hours. (V4:T 402.) He said they were looking for more drugs, but neither of them had any money. (V4:T 403.) There were guys who wanted to rent Tucker's vehicle and Tucker would not do it because he did not know them. (V4:T 403.) Tucker told Appellant he was a nice guy and he could

trust him, so he gave Appellant his vehicle and Appellant told him he would be back in an hour or two. (V4:T 403.) Appellant said the only way he knew that he could get more drugs was to rent out Tucker's vehicle behind his back, which is what he did. (V4:T 403.)

Appellant said he went back to the neighborhood where they had been driving around looking for drugs and rented the truck to two guys. (V4:T 404.) He turned the car over to the guys at the BP Station and they dropped Appellant off at the store and he went in and got a few things and then went and got the drugs. (V4:T 405.) The guys were supposed to be back in a couple of hours and Appellant waited at the BP station, but they never came back. (V4:T 405-06.) He stayed there until ten or eleven o'clock that night. (V4:T 407.) One of the men was Weezum Demanchi and the other is called Red, but he does not know his full name. (V4:T 405.)

(Exh 2: Answer Brief of Appellee at pp. 1-12).

The State correctly argued in its brief there was sufficient evidence from which the jury could reasonably infer that after Griffin obtained use of the 4-Runner for the express purpose of obtaining more money and drugs, he robbed the Dollar General store with another, shorter man who was armed with a handgun, and took over six hundred dollars. Further, evidence showed that Griffin, whose license was suspended or revoked, was the driver of the 4-Runner in which he and the other man fled, and that Griffin failed to stop when being pursued by a uniformed law enforcement officer in a marked vehicle. Griffin's theory of innocence merely created a contradiction in the evidence, which the jury resolved against Griffin's position. The court's affirmance of the robbery conviction on direct appeal establishes that as a matter of state law, there was sufficient evidence of Griffin's participation in the robbery to overcome Griffin's theory of innocence.

Ground one does not warrant habeas relief.

Ground Two

Griffin alleges trial counsel was ineffective for failing to move the trial court to sever Count 1 of the Information from Counts 2 and 3. Griffin raised this claim in ground 8 of his Rule 3.850 motion, and it was properly rejected by the postconviction court without a hearing.  In order to show a violation of the Sixth Amendment right to counsel, Griffin must satisfy the two-pronged inquiry of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Bell v. Cone*, 535 U.S. 685, 698 (2002)(courts should apply *Strickland* to claims that counsel failed to satisfy constitutional requirements at specific points).

Griffin cannot establish deficient performance or prejudice. Griffin alleges the postconviction court did not make a finding as to ground 8 of the postconviction motion. See § 2254 petition at p. 17. This allegation is incorrect. In its order dated January 19, 2007, the court stated:

> Finally, in its Response to Claim 8 the State argues that the offenses the Defendant is charged with are based on connected acts or transactions; and, that offenses may be severed only where improperly joined, or where severance is essential to "promote a fair determination of the defendant's guilt or innocence." See Section 3.152(a)(1)-(2), Fla. R. Crim. P. (2006). The Court agrees with the State's arguments, incorporated herein by reference. Therefore, Claim 8 is DENIED.

(Exh 8: Order on Defendant's Motion for Postconviction Relief; Order Granting Evidentiary Hearing; and Order Setting Status Conference at p. 3).

As to this claim, the State's arguments in pertinent part were as follows:

> The Defendant's eighth claim of error revolves around his position that Trial Counsel should have moved to sever count 1, the robbery of the Family Dollar store, from counts 2 and 3, the driving charges. See Defendant's Motion at 74. He "asserts that there was no positive link between the robbery count and the other two counts." The Record refutes this claim, as detailed in the undersigned's response to Claim 7(c) supra. Further, it is clear that the

Defendant's flight from police shows his consciousness of guilt and is part of an ongoing criminal offense; therefore, it is inextricably intertwined with the robbery and a motion to sever would not have been granted.

It is clear that multiple offenses may be joined where they are based on connected acts or transactions. See Fla. R. Crim. P. 3.150(a) (2006); see also *Rodriguez v. State*, 30 Fla. L. Weekly S 385; 2005 LEXIS 1169, *35- 57 (Fla. Jan. 19, 2006 (as revised)). The undersigned has detailed supra in her response to Claim 7(c) how the robbery and subsequent flight are intertwined. Offenses may be severed only where improperly joined, or where severance is essential to "promote a fair determination of the defendant's guilt or innocence." See Fla. R. Crim. P. 3.152(a)(1)- (2) (2006).

In *Fotopoulos v. State*, 608 So. 2d 784, 790 (Fla. 1992), a defendant appealed his conviction, in part claiming that the trial court had erroneously denied a motion to sever. There, as here, the defendant claimed no commection [sic] between several offenses. See id. Specifically, the defendant claimed that two days after one murder, he recruited a witness to engage in a second murder and used the first as a coercive tool to gain the witness's cooperation. *See id.* He wanted these offenses severed, and the trial court denied the motion. *See id.*

The supreme court mused that offenses are only related for the joinder rules where they arise from "connected acts and transactions." *Id.* (citing Fla. R. Crim. P. 3.151(a)(1991)). It found that "connected acts and transactions" must be connected "in an episodic sense." *Id.* (citing *Garcia v. State*, 568 So. 2d 896, 899 (Fla. 1990)). The two murders in Fotopoulos's case were "connected in an episodic sense." *Fotopoulos*, 608 So. 2d at 790.

As in *Fotopoulos,* the Defendant's flight from justice immediately after robbing the Family Dollar store is episodically connected to that robbery. This is illustrated by the citations to the Record in the undesigned's [sic] response to Claim 7(c) supra. Since these episodes are episodically connected, the Defendant cannot show a reasonable probability of success, had Trial Counsel moved to sever these offenses. The Record refutes the Defendant's claim that these counts are not episodically connected, and this Honorable Court should deny the Defendant's eighth claim of error.

(Exh 7: State's Response to the Court's Order to Show Cause at pp. 19-21).

The underlying issue of Griffin's Rule 3.850 ineffective assistance of counsel claim is state-law based. The postconviction court, and in turn, the state appellate court by its

affirmance, have answered the question of whether Griffin was entitled to severance of the charges. Because a motion to sever would not likely have been granted as a matter of state law, trial counsel cannot be ineffective for failing to file such motion. Therefore, Griffin is unable to establish ineffective assistance of counsel as to either the performance or prejudice prong of Strickland, and the state court's denial of this postconviction claim is entitled to deference under the AEDPA.

Ground two does not warrant habeas relief.

Ground Three

Griffin alleges his trial counsel was ineffective for failing to interview and call at trial three potential alibi witnesses: Walter Harvey, Williamson Dimanche, and Shanita Howard. This issue was raised in ground 1 of Griffin's motion for postconviction relief, and was resolved after a full and fair evidentiary hearing. This claim must be denied for the following reasons.

First, ground three is procedurally barred because Griffin abandoned the issue in his initial pro se brief in the postconviction appeal. See Exh 11: Initial Brief of Appellant at p. 2. [1] A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). See also, *Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003)("A state prisoner seeking

_____

[1] Griffin states in his brief: "The Appellant will not be addressing claim 1 in this brief."

federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); Duncan v. Henry, 513 U.S. 364, 365 (1995)("Exhaustion of state remedies requires that the state prisoner fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights").

Griffin waived or abandoned Ground 1 of the Rule 3.850 motion because he did not raise or argue this specific issue in his initial brief filed in the postconviction appeal. In fact, Griffin expressly chose not to present this issue to the appellate court. Therefore, the issue is now procedurally barred. In an unpublished opinion, the Eleventh Circuit addressed this issue and differentiated between a state postconviction appeal following a summary denial and an appeal following a postconviction proceeding for which an evidentiary hearing was granted, as it was in this case:

> Cortes's appeal did not follow an evidentiary hearing, and, therefore, he was not required to file an appellate brief. Furthermore, his decision to do so and to address only some of the issues does not waive the remaining issues raised in his Rule 3.850 motion. *See Webb v. State*, 757 So. 2d 608, 609 (Fla. Dist. Ct. App. 2000). Therefore, Cortes did exhaust his state remedies prior to filing his § 2254 petition. In contrast, had Cortes received an evidentiary hearing, his failure to address issues in his appellate brief would constitute a waiver. (footnote omitted).

*Cortes v. Gladish*, 2007 U.S. App. LEXIS 2833 (11th Cir. 2007) (emphasis added) (unpublished). The Eleventh Circuit correctly stated that in Florida, in non-summary proceedings, briefs are required and failure to include and argue any preserved issue in the initial brief acts as a waiver. See Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006) (citing *Shere v. State*, 742 So. 2d 215, 217 n.6 (Fla. 1999) (per curiam); *Coolen v. State*,

696 So. 2d 738, 742 n.2 (Fla. 1997) (stating that a failure to fully brief and argue points on appeal "constitutes a waiver of these claims") (quoted in *Simmons v. State*, 934 So. 2d 1100, 1111 (Fla. 2006)). *See also, Hall v. State*, 823 So. 2d 757, 763 (Fla. 2002) ("[A]n issue not raised in an initial brief is deemed abandoned and may not be raised for the first time in a reply brief.").

Florida Rule of Appellate Procedure 9.141(b)(2) provides that in appeals from the summary denial of a Rule 3.850 motion without an evidentiary hearing, "[n]o briefs or oral argument shall be required, but any appellant's brief shall be filed within 15 days of the filing of the notice of appeal. The court may request a response from the appellee before ruling." Fla. R. App. P. 9.141(b)(2)(C). In contrast, in an appeal of a Rule 3.850 order after an evidentiary hearing, the movant is required to file an appellate brief, and the movant waives a claim if he does not include the claim in the brief with argument on the claim. *See, e.g., Shere v. State*, 742 So.2d 215, 224 n.6 (Fla. 1999); *Duest v. Dugger*, 555 So. 2d 849 (Fla. 1990). Because Griffin's postconviction appeal was from a Rule 3.850 order denying relief after an evidentiary hearing, he was required to file a brief on appeal of the denial of postconviction relief and to provide argument relative to each ground. *Reaves v. Crosby*, 837 So. 2d 396, 398 (Fla. 2003)(Other than one cursory sentence, there was no argument relative to a ground; ground was not properly before the state court where other than one cursory sentence, there was no argument relative to the claim). By choosing not to brief the issue presented in Ground 1 now raised in the federal petition as Ground Three, Griffin waived and defaulted this claim.

Claims that are procedurally defaulted in state court are not reviewable by this Court unless the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent" contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986)(explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'to be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). Griffin cannot avoid the procedural bar because he has neither argued nor shown the existence of cause and prejudice. Moreover, Griffin does not qualify for the fundamental miscarriage of justice exception because he has no new and reliable evidence of actual innocence. *Schlup v. Delo,* 513 U.S. at 321-322. Accordingly, ground three is unexhausted and procedurally barred.

Alternatively, even if ground three were not procedurally barred, Griffin is not entitled to relief because his argument lacks merit. In its final order denying the motion for postconviction relief, the state court recognized and reasonably applied the standard for assessing ineffective assistance of counsel claims found in *Strickland v. Washington*, 466

U.S. 668 (1984), and reasonably determined Griffin failed to establish either prong of the

*Strickland* test. The order sets out the following findings of fact and conclusions of law:

**Findings of Fact**

The Defendant testified that he told Mr. Trogolo (trial counsel) about the three alibi witnesses prior to trial. The Defendant testified that trial counsel told him they would not make good witnesses due to their drug backgrounds and because trial counsel intended to employ a strategy at trial that involved a misidentification of the Defendant as the guilty party. The Defendant further testified that he agreed to trial counsel's strategy of not using these witnesses.

Trial Counsel testified that the Defendant did not identify Walter Harvey or Shanita Howard, the Defendant's cousin, as potential alibi witnesses during "numerous" discussions he had with the Defendant before and during trial. Trial counsel testified that he had talked to the Defendant's family on several occasions concerning trial strategy and they had not mentioned Walter Harvey or Shanita Howard as potential witnesses. Trial counsel testified that he was well aware of Williamson Dimanche as the individual to whom the Defendant had loaned his truck. Mr. Dimanche was also the individual who trial counsel suggested had committed the offense as part of his misidentification strategy at trial. Trial counsel therefore did not have any intention of calling Mr. Dimanche as a matter of strategy.

Trial counsel further testified that he had had an opportunity to observe and listen to Walter Harvey's and Shanita Howard's testimony at the evidentiary hearing and that he doubted that he would have called Walter Harvey as a witness at trial based on Mr. Harvey's past record and demeanor on the stand. Trial counsel testified that he probably would not have called Shanita Howard at trial and was concerned that her testimony concerning the exact date she saw the Defendant at the BP service station was questionable and was somewhat lacking in credibility. As a matter of strategy, trial counsel questioned whether he would have called either Walter Harvey or Shanita Howard at trial.

**Conclusions of Law**

. . .

First, the Court will accept for analysis, without so finding, the Defendant's version of events, as testified to at the evidentiary hearing, to be true. Accepting Defendant's version of events, the Defendant told his trial counsel of the alibi witnesses in question and that his counsel explained to him that he had decided not to call these witnesses as he was concerned with their

- 21 -

credibility and that they did not fit into trial counsel's defense strategy of misidentification. The Defendant testified that he accepted trial counsel's judgment in this regard. After hearing Walter Harvey's and Shanita Howard's testimony and trial counsel's testimony concerning his trial strategy, the Court finds that, even accepting the Defendant's version of events, the Defendant has not met either the first or second prong of *Strickland*. The Court cannot find that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. Additionally, the Court cannot find counsel's alleged errors prejudiced the defense so as to deprive the defendant of a fair trial. At trial, evidence was presented that identified the Defendant as the perpetrator of the robbery. Additionally, evidence was presented that indicated the fingerprints of the Defendant were found at the scene of the robbery. The Court did not find the testimony of Walter Harvey or Shanita Howard to be credible. Therefore, the Court finds the lack of their testimony at trial does not undermine the Court's confidence in the outcome of the case.

However, trial counsel testified that the Defendant had not told him of Walter Harvey or Shanita Howard. The Court finds trial counsel to be more credible than the Defendant in this regard; and, if trial counsel was unaware of these two witnesses, he cannot be found ineffective in not interviewing or calling witnesses of whom he had no knowledge. Having heard the testimony of both witnesses at the evidentiary hearing, trial counsel testified that it was highly unlikely he would have called either Walter Harvey or Shanita Howard based on a their lack of credibility. As already stated, the Court finds that their testimony lacked credibility. Mr. Harvey's past criminal record and demeanor on the witness stand called his testimony into question. Shanita Howard's testimony as to the exact date she saw the Defendant at the BP service station was questionable. Her testimony appeared to be that she saw the Defendant at the BP service station on the same day he became a suspect in the case, which was several days after the robbery with which the Defendant is charged.

The court finds that trial counsel's decision not to call Mr. Dimanche as an alibi witness comports with trial counsel's strategy of misidentification and strategy of blaming Mr. Dimanche for commission of the crimes. To question trial counsel's decision in this regard would be to employ "the distorting effect of hindsight" warned against by *Strickland*. Additionally, Defendant failed to produce Mr. Dimanche at the evidentiary hearing. As such, Defendant has failed to establish what he would have actually testified to at trial. The Court finds this is, in and of itself, fatal to Defendant's claim regarding Mr. Dimanche.

Based on the above, the Court finds that trial counsel made no error so serious that counsel was not functioning as the counsel guaranteed by the

Sixth Amendment as asserted in Claim 1 of Defendant's Motion. Additionally, the Court cannot find the result of the trial would have been different had Walter Harvey, Williamson Dimanche, and Shanita Howard been called as alibi witnesses. The Court finds, as it did above, that these witnesses lack sufficient credibility to undermine the Court's confidence in what was the outcome of the case. Even assuming trial counsel's performance was deficient, Defendant has failed to establish that, but for counsel's errors, there is any reasonable probability that the outcome of the trial would have been different. *See Bowman v. State*, 748 So. 2d 1082 (Fla. 4th DCA 2000)("[W]hile the alibi evidence conceivably could have affected the verdict, *Strickland* requires more than a showing that the errors had some conceivable effect on the outcome. The defendant must demonstrate a reasonable probability - i.e., one that undermines confidence in the outcome - that absent counsel's errors, the fact finder would have had a reasonable doubt respecting guilt. *Strickland,* 466 U.S. at 694.")

Additionally, at the evidentiary hearing the Defendant testified that he had also given the names of Walter Harvey, Williamson Dimanche, and Shanita Howard to the attorney who had represented him prior to trial counsel taking over the case, Renee M. Reid. Trial counsel testified that he had discussed the Defendant's case with Ms. Reid and that she had not mentioned these three alibi witnesses. Trial counsel also testified that he had access to Ms. Reid's notes and papers concerning the case and found no mention of the witnesses. The Court finds trial counsel's testimony credible in this regard. Although the Defendant has not alleged any claim concerning Ms. Reid in his motion, the Court finds that, even if error occurred in the passing of this information between the two attorneys, *Strickland*'s two-prong test has not been met. The Court reaches this finding because, even imputing knowledge of these three witnesses to trial counsel, the Court has already found that his decision in not calling the witnesses did not constitute an error so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. In the same regard, the Court has already found that counsel's alleged errors would not have so prejudiced the defense so as to deprive the defendant of a fair trial.

Based upon all of the above, it is ORDERED AND ADJUDGED that Defendant's Motion for Post Conviction Relief is DENIED, in toto. Defendant has thirty (30) days from the date of this Order in which to appeal this Order to the Second District Court of Appeal.

(Exh 10: Final Order on Defendant's Motion for Postconviction Relief at pp. 3-7).

The postconviction court found that the testimony of the two alleged alibi witnesses was not credible, and Griffin has not rebutted this finding by clear and convincing evidence. Even if counsel had located and called the witnesses to testify at trial, there is no reasonable probability that the result of the proceeding would have been different. The state court's denial of ground three is neither contrary to, nor an unreasonable application of, the *Strickland* standard, and Griffin's claim must be denied pursuant to 28 U.S.C. § 2254(d) and (e).

Ground three does not warrant habeas relief.

Accordingly, the Court orders:

That Griffin's petition is denied.  The Clerk is directed to enter judgment against Griffin and to close this case.

## CERTIFICATE OF APPEALABILITY AND

## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to

proceed further.' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on August 31, 2010.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record
James Lamar Griffin